George T. HOUSTON, III and Mrs. Ruth H. Jarvis Baker, Plaintiffs-Appellants,

v.

UNITED STATES GYPSUM COMPANY, a corporation, Defendant-Appellee.

No. 76–2988.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1978.

---

2. *Lumpkin* thus applies only to convictions final after March 17, 1971.

Frank E. Everett, Jr., Robert A. Weems, Vicksburg, Miss., for plaintiffs-appellants.

J. A. Lake, Greenville, Miss., for defendant-appellee.

ON PETITION FOR REHEARING

Before COLEMAN and FAY, Circuit Judges, and KING,* District Judge.

COLEMAN, Circuit Judge.

The Court was not altogether unmoved by the eloquently written and earnestly presented petition for rehearing filed by able counsel for the appellants in response to our opinion in this case, 569 F.2d 880. We requested a response from appellee, which was promptly filed in an equally able manner.

In passing on rights of liberty and property, courts are always concerned that no error be made, and the duty is all the more urgent in a case which may correctly be denominated as close on the law, or close on the facts, or both.

There is no dispute about the facts in this case, and it must be emphasized that our decision is limited to those facts. The parties agree, and so do we, that the controlling law is that of the State of Mississippi, not the general law of riparian rights as it may have been developed in other jurisdictions. Moreover, as demonstrated in the published opinion, the Mississippi law of riparian rights, as enunciated by the State Supreme Court, may differ from that announced in some jurisdictions.

Upon much thought and reflection, being bound in this diversity case by the decisions of the Mississippi Supreme Court, we are left without any sound reason for holding that the case should not be controlled by *Archer v. So. Ry. Co. in Mississippi*, 114 Miss. 403, 75 So. 251 (1917).

It is true that the Court did not there buttress its decision with any prolonged or incisive analysis of the common law of riparian rights. Indeed, it acknowledged that "there is a singular absence of authority on the precise question involved in this case". The Court concluded that it should stand "safe within the boundaries of the general principles of convenience, justice, and common rights of property". With that in mind, the Court said that "There must be some limit of the ownership of islands formed offshore in nonnavigable rivers and . . . we fix the limit at the line of the coterminus owner . . .".

* District Judge of the Southern District of Florida, sitting by designation.

■ Whether this is "good riparian law", or not, it is the last pronouncement of the Mississippi Supreme Court on the subject. It has stood unchanged for sixty years. It was on the books when the Houstons acquired title to Stack Island in 1934. It was on the books when the accretions in question began forming in 1925. The Houstons were legally chargeable with knowledge of the pronouncements of the Supreme Court when they acquired the island. The result does not cut the island off from lateral access to the main channel of the river as it presently runs.

In our original opinion we noted that the facts in *Archer* differed from ours in four respects:

> (1) the Houstons and Gypsum were not coterminous owners on the east bank, as had been true of Mrs. Archer and Southern; (2) the island as originally owned by the Houstons was an independent entity, sold as such by the government in 1888, and its ownership did not arise by riparian connection to the river bank; (3) the accretions to Stack Island were downstream rather than upstream; (4) Stack Island was on the opposite side of the main channel, whereas the *Archer* island was between the lands of the Southern Railway Company and the thread of the stream. [The element of access was not discussed.]

569 F.2d at 884.

We are convinced that the Mississippi Supreme Court would hold that these differences do not change the result when one considers the policies which underlie the general law of accretions as applied to conflicting riparian rights.

We begin with an examination of the policies involved in the law of accretion to riparian property. At least six such policies can be readily identified. See, Lundquist, *Artificial Additions to Riparian Land Extending the Doctrine of Accretion*, 14 Ariz. L.Rev. 315, 322–23 (1972); Annot., 61 A.L. R.3rd 1173 (1975). First, the rule has part of its roots in the Roman theory of accession, which grants the riparian landowner the accretions to his property just as the owner of a tree becomes the owner of the fruit produced by that tree. Second, where waterways serve as the boundary between property owners and/or sovereigns, convenience and perhaps necessity mandate that the waterway should continue to serve as the boundary. A third idea is that where accretion slowly deposits new soil onto the property of the riparian owner, the new land should go to that owner under the maxim *de minimis non curat lex.* A fourth reason is based upon the general policy of the law to promote the highest and best use of the land. The riparian owner is in the best position to develop and utilize that land, and he should be given the opportunity to do so. This may be denominated the "productivity theory". Fifth, the "compensation theory" considers the risks assumed by a riparian owner. Just as he is subject to losing land through the process of erosion, he is allowed to gain land through the process of accretion. All landowners are thus treated fairly by being equally exposed to the vagaries of nature. Finally, and perhaps most importantly, the riparian character of the land is itself a valuable asset and should remain an integral part of the land, that is, the riparian owner should continue to have the right to launch his vessels and to build his docks and wharves. In general, then, the rules on accretion add some certainty and predictability to property law.

So long as the island accretions do not interfere with the riparian access of a landowner on the bank, the owner of the island stands in nearly identical stead to a riparian owner on the opposite bank and arguably should be treated in identical fashion. Each riparian owner gains through accretion and loses through erosion. The land which he gains can be productively employed immediately, and he preserves his riparian access. Arguably, the policies behind the accretion rights of a riparian owner should all favor the island owner, at least insofar as the accretions do not interfere with the riparian access of another. The island owner is arguably entitled to the "fruits" of his tree, to compensation for his

losses through erosion, to the productive employment of the new land, and to a continued right of riparian access. In addition, the maxim *de minimus non curat lex* is often applicable. These reasons would seem to justify the general rule that an island owner owns, either expressly or impliedly, the bed of the river to the middle of the channel between the island and the bank of the river. *See generally* Annot., 54 A.L.R.2d 643, 648–650 (1957), especially as to lateral accretions (a situation which is not before us).

■ The problem of property boundaries complicates the picture in *lengthwise* accretions. If the state owns the riverbed, it seems to be the general rule that lengthwise accretions to an island belong to the owner of the island. *See, e. g., Van Dusen Invest. Co. v. Western Fishing Co.*, 63 Or. 7, 124 P. 677, 126 P. 604 (1912); *Fillmore v. Jennings*, 78 Cal. 634, 21 P. 536 (1889). This rule interferes with no private property rights, and the public, through the state, retains the right of navigation.

However, in other states, and certainly in Mississippi, the riparian owner, not the state, owns the riverbed to the middle of the stream. This is what the Supreme Court confronted in *Archer, supra.* It resolved the difficulty by laying down the general rule that the island owner is not entitled to lengthwise accretions which extend beyond the lateral extensions of riparian property lines. *See also, St. Louis v. Rutz*, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941 (1890) (applying Illinois law); *McGill v. Thrasher*, 221 Ky. 789, 299 S.W. 955 (1927); *Nugent v. Mallory*, 145 Ky. 824, 141 S.W. 850 (1911).

This rule strikes a balance between the rights of competing property owners (one of which owns the island and one of which owns the riverbed, either above or below the island) in a manner which favors *certainty* of application, always a prima object of the law where property rights are involved. One who purchases an island in the Mississippi River necessarily realizes that his island may be entirely washed away in a flood any year. Likewise, he knows that the river may gradually accomplish the same result. If the island disappears, the owner presumably is entitled to no more than the riverbed area which his island once occupied because the remainder of the riverbed belongs to other owners.

If the river suddenly shifts, as the Mississippi often does, leaving both the island and the former riverbed as dry land, then the rule provides some certainty in resolving disputes as to ownership under the new situation. The former riparian owner still owns the riverbed, but it is now dry land. The island owner still owns his island land, and he also owns the new dry land up to the middle of the stream as formerly located.

■ If we analyze lengthwise island accretions through economics, it is easier to see the merits of the rule. The riparian landowner knows exactly how much of the riverbed he owns, and he also can readily observe the extension of his own property line to the middle of the stream. If he observes that the island, which was formerly not opposite his property, has grown through accretion so that it now covers part of his riverbed, he can estimate the value of the land which is rightfully his, the cost of laying his claim to it, the probable income from utilizing the land, and the probable expenses attendant to that effort. In addition, he must assess the risk that his capital investment may be lost. If he decides that the return is not justified by the expense and risk, or if he simply sleeps on his rights, the island owner is in a position to claim through adverse possession. The latter also will employ similar calculations, but his operating expenses may well be lower. At some point, however, he must claim the land and utilize it if he is to gain title through adverse possession.

For all these reasons we reaffirm the view that the District Court was correct in denying appellants title to those lengthwise accretions to Stack Island extending over the boundary theretofore existing between them and Gypsum.

We likewise adhere to the view that in the first instance it is for the District Court

to find the facts and apply the law to the issue of adverse possession.

The petition for rehearing is DENIED.