# WIDDECOMBE v. CHILES et al., Appellants.

**Division One, March 18, 1903.**

1. **Accretions: TO LAND NOT ORIGINALLY RIPARIAN: GOVERNMENT PATENT TO RE-FORMED LAND.** If a particular tract of land was at the time of the Government survey entirely cut off from the river by an intervening tract, and that intervening tract is entirely washed away so that the remoter tract is reached by the river, the latter tract becomes riparian as much as if it had been originally such. And if accretions are added to this latter tract until it extends out over and beyond what was formerly the intervening tract, the lands thus made do not belong to him who formerly owned the intervening tract, but to the owner of the remoter riparian tract to which they have become accretions. Nor is this law altered by the fact that the Government's patent to the intervening tract was not issued until such intervening tract had entirely washed away and the accretions to the remoter tract had formed and extended again over what was once the intervening tract.

2. ——: ——: ——: **CASE STATED.** No part of the south half of the section, at the time of the Government's survey, touched on the river, but between it and the river was a narrow strip containing 8.68 acres, and this was marked on the survey plats as the "fractional north half". Afterwards the river washed away the whole of this "fractional north half", and encroached on the south half, and then began to bear off towards the north again, building up the lands against its south bank until they extended out over and beyond what was originally land in the north half, and thereupon plaintiff obtained from the Government its patent to the 8.68 acres, the land being described as "the fractional north half" and brought suit against defendant, the owner of the south half, for possession. *Held*, that the made lands, being accretions to the south half, belong to the owner of such south half, nor is his right thereto affected by the fact that no patent was issued for the north half until after the original lands in the north half had washed away and re-formed as accretions to the south half.

Appeal from Jackson Circuit Court.—*Hon. H. L. McCune*, Special Judge.

REVERSED AND REMANDED.

*Paxton & Rose* for appellants.

(1) When the eight-acre strip went entirely into the river, it never came back, though land may afterwards have formed within its original lines. As long as any part of a tract remains it may gain accretion and grow larger, but after it has entirely disappeared it can never come again. Naylor v. Cox, 114 Mo. 243; Penker v. Canter, 62 Kan. 363; Welles v. Bailey, 55 Conn. 292; Wallace v. Driver, 61 Ark. 429; Cox v. Arnold, 129 Mo. 337. (2) The accretions that were formed belong to the land which bordered on the river when they began to form, and not to a tract which was not in existence at the time the accretions began. (3) The State of Missouri, by virtue of its sovereignty, owns the bed of the Missouri river, and when this eight acres went into the river it became the property of the State, and, in no event, could have come back as the property of the United States. Cooley v. Golden, 117 Mo. 51; Wood v. Fowler, 26 Kan. 690; Hardin v. Jordan, 140 U. S. 371; State ex rel. v. Longfellow, 69 S. W. 374. (4) When plaintiff's grantor purchased land from the United States, he purchased it subject to the laws of the State of Missouri. Benson v. Morrow, 61 Mo. 353; Cummings v. Powell, 116 Mo. 473; Hardin v. Jordan, 140 U. S. 371. (5) The soil that was owned by the United States washed away, and no one can say where the present soil came from. It is a growth to the land that bordered on the river when the accretion began.

*J. N. Southern* for respondent.

(1) The title to the land conveyed by the United States Government by its patent dated October, 1896, under which respondent claims, and of the accretions added thereto, is vested in respondent. An act of Congress of April 24, 1820, entitled "An act making further provision for the sale of public lands;" Turner v. Don-

nelly, 70 Cal. 597; Menteer v. Cromellin, 18 Wall. (U. S.) 87.  (2)  The change of the channel of the river from a point entirely west of the land described in the patent, from the north side of said land to the south side of the same in the years of 1840 or 1841 up to the years of 1850 or 1851, and the filling up the new channel again at the west side where the river first broke through in the  restoration of the  current to the  old channel north of the land in question, did not divest the United  States of the  title to the land in  controversy. Tiedeman on Real Property (Enl. Ed.), sec. 686; Steele v. St. Louis Smelting Co., 106 U. S. 447; Moore v. Robbins, 96 U. S. 530; Atlantic Delaine Co. v. James, 94 U. S. 207; United States v. Stone, 2 Wall. 535; Bagnell v. Broderick, 13 Pet. (U. S.) 450; Mulny v. Norton, 100 N. Y. 426; s. c., 53 Am. Rep. 206; Bates v. Railroad, 1 Black 204; Widdecombe v. Miller, 118 Fed. 295.  (3) The land sued for at the time of the Government survey and plat, about 1826, and at the time it was conveyed by the Government in 1896, lay and now lies north of the half-section line and between said land and the river. None of the calls of appellant's patents or deeds reach the river and they were not by their patents and deeds riparian owners.  Hence, their claim here can not be sustained.  Smith v. St. Louis Public Schools, 30 Mo. 290; Benson v. Morrow, 61 Mo. 345; Burris v. Russell, 86 Mo. 209; Ellinger v. Railroad, 112 Mo. 525; Swearingen v. St. Louis, 151 Mo. 348.

VALLIANT, J.—This is an action in ejectment for possession of the northeast quarter and the east one-half. of northwest quarter of section 22, township 51, range 30, in Jackson county, containing about 230 acres.  The land in suit is the result of the land-building propensity of the Missouri river, and the question is whether it was an accretion to the north half of section 22 or the south half.

By the United States survey in 1826, section 22 was a fractional section, consisting of the south half, which was a full half-section, and a small strip containing 8.68 acres lying along the north line of the south half and extending to the Missouri river. This strip of 8.68 acres was all there was of the north half and it lay between the south half and the river thus:

From 1826 to 1853 the river gradually changed its bed by cutting away its south bank until it had washed away all of the 8.68 acres forming the fractional north half of the section and a considerable part of the south half, so that not only was the south bank of the river in the south half of the section, but the whole river flowed through the south half and converted it into a fractional half section. About 1853 the river ceased encroaching and began gradually to rebuild where it had washed away, and this process continued until 1896, when it had not only rebuilt where it had washed away, but had added more than 200 acres, which would have been in the north half of the section if it had existed when the Government survey was made in 1826.

In 1896 plaintiff's grantor obtained a patent from the United States for the fractional north half of this section, containing, in the words of the patent, "eight acres and sixty-eight hundredths of an acre."

The claim of the plaintiff is that the accretion was to the 8.68-acre strip, and if that is true he is entitled to recover. The defendants claim that the accretion was to the south half of the section, and if that is true the judgment should be for them. It was agreed that if plaintiff was entitled to recover his damages should be assessed at one dollar, and the rents and profits at four dollars a month.

The court gave peremptory instructions for the plaintiff which resulted in a verdict and judgment in his favor, from which the defendants appeal.

The principles upon which the decision of this case must be founded have already been established by previous decisions in this court, although, perhaps, the identical question, at least the question in identical form now before us, has not been answered.

In Naylor v. Cox, 114 Mo. 232, the facts were that in 1817, when the Government survey was made, there was an island in the river which afterwards became the property of the plaintiff. The land of the defendant in that suit was shown by that survey to be on the north bank of the river, the main channel of which ran between the island and defendant's land. The river made encroachments on defendant's land, thereby pushing its north bank farther north and taking into its bed a portion of what had been defendant's land. After a while it changed its course, the main channel got around on the south side of the island and accretions began to form against the north side thereof, and in the course of time these accretions extended across what had formerly been the bed of the river and covered that space where defendant's land had been before it was washed away.

The defendant in that case insisted that, when the accretions reached the place where according to the old survey his land had been, they became his property, being in fact his land restored.

But this court, per GANTT, P. J., said: "On the contrary, if after the original survey in 1817 a part of said fractional section 4 was washed away by the river, and the main channel of the river covered the place where it originally stood, for any considerable length of time, and afterwards accretions to the island began and gradually grew and extended north towards the north bank until they went beyond what was originally the southern or river boundary of said section 4, said accretions thus formed to the island belonged to the owner of the island, and not to the owner of the original fractional section 4." In support of that doctrine the court cites the following cases: Wells v. Bailey, 55 Conn. 292; Buse v. Russell, 86 Mo. 209; Nebraska v. Iowa, 143 U. S. 359.

The principles there laid down are, that the accretions belong to the man who owns the land against which the deposits were made, and that they do not belong to the man who owns land against which such deposits were not made although they cover a space where his land was before the river washed it away. The only difference between that case and this is that there the original lands of both parties were riparian and neither at any time ceased to have a visible body above water and a river front, while here the original land which the plaintiff's patent calls for had been washed away entirely, and the land of the defendant did not have a river front until the eight-acre strip had been cut away by the river. Yet the principles deduced from that case are applicable here. If there had been an island in front of this eight-acre strip in 1826 when the survey was made, and if after the strip had been cut away and the river had encroached far into the south half of the section, accretions had formed against the island and ex-

tended over the eight-acre strip and over the washed-away part of the south half, the law as declared in Naylor v. Cox would have given the title to the owner of the island, although the accretions filled the space that had once been filled by the eight-acre strip and the washed away part of the south half of the section.

The land in dispute in Naylor v. Cox became the subject of another suit between the same parties, and reached this court under the style of Cox v. Arnold, 129 Mo. 337. In the latter case the evidence seemed to show that the made land in dispute was the result of a towhead which had risen out of what had been the bed of the river, and that accretions were made to the towhead until it reached the main land. The plaintiff in that case, who was the defendant in the Naylor suit and was the owner of the mainland, contended that as the new land had come up out of the bed of the river in the space where his land had been before it was washed away, it belonged to him and not to the owner of the island. But the court held that, as he was the plaintiff in the case, it was not sufficient for him to show that the land was not an accretion to the island or that it was an accretion to the towhead where his land had once been, but that before he could make his title good he must show that it was an accretion to his mainland, and that the fact that the towhead came up out of the bed of the river at a point where his land was before it was washed away, did not constitute it his land restored.

The facts in the case at bar do not make it necessary for us to decide to whom the accretion would have belonged if it had grown from a towhead that had come up out of the bed of the river in the place where the eight-acre strip had once been, for there is no evidence tending to show such a condition.

This court in every case that has come before it involving the subject of accretions to riparian lands has held that in order to show title to the accretions, one must show that they were formed by deposits against

visible land which he or his grantors owned.   [Buse v. Russell, 86 Mo. 209; Hahn v. Dawson, 134 Mo. 581; Price v. Hallett, 138 Mo. 561.]

The question in the very form we now have it has been decided by the Supreme Court of Connecticut in a case referred to in Naylor v. Cox, supra.   The Connecticut court said:

"They say, in the first place, that the law of accretion applies only to the case of riparian land, and that as the plaintiff's lot did not originally bound upon the river, but was conveyed to him by distinct lines and boundaries, at least upon the sides affected by the present question, it can not become, by any changes of the river, riparian land.   We can not accede to this claim. If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be gradually washed away until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such.   This follows necessarily from the ordinary application of the principle.   All original lines submerged by the river have ceased to exist; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation and is not affected in any manner by the relations of the river and the land at any former period.   If, after washing away the intervening lot, it should encroach upon the remoter lot and should then begin to change its movement in the other direction, gradually restoring what it had taken from the remoter lot, and finally all that had been taken from the intervening lot, the whole by the law of accretion would belong to the remoter but now proximate lot.   Having become riparian, it has all riparian rights.   This general principle is recognized by all text-writers and by numerous decisions of the English and American courts.   The river boundary is treated in all cases as a natural boundary and the rights of the parties as changing with the change of its bed.

"The defendants claim, in the next place, that though a riparian owner may take by accretion to the middle of the stream, or in case of a navigable river to high-water mark, yet that that being the limit of his original title, and in the case of a non-navigable river the line of the adjoining owner, he can not take such accretion beyond that line. This claim is utterly without support." [Wells v. Bailey, 55 Conn. 292.]

That case is referred to with approval in Peuker v. Canter, 62 Kas. 363, and Wallace v. Driver, 61 Ark. 429, in both of which, also, our case of Naylor v. Cox, and Cox v. Arnold, are quoted with approval.

We are cited by respondent to Crandall v. Allen, 118 Mo. 403, as holding contrary to the doctrine above mentioned, but we do not so understand that case. There the plaintiff's land was bordered by the river. It lay north of the land of defendant and between it and the river. But in the course of time so much of the plaintiff's land washed away as that it brought the river to defendant's land and gave him a river front, but it did not wash away all of the plaintiff's land. Then, when the river changed it began building land against the defendant's front and continued the process until the new made land came in front of plaintiff's land and there were accretions to the plaintiff's land also. The contention of the defendant was that he was entitled not only to the accretions to his own front, which were conceded to him, but also to that in front of the plaintiff, because the land-building had its beginning on his land, but it was held that he was entitled only to that formed on his own front. The court said: "We find nothing in the record that questions that this accretion in front of plaintiff's land *formed to his shore.*" The court by no means qualifies what it said in Naylor v. Cox, but reaffirms it. Crandall v. Allen is itself authority for the proposition that land, though it did not reach the river when it was originally surveyed, or when the party bought it, yet became riparian land when the interven-

ing land is cut away by the river, and that the owner has title to accretions formed against it.

In support of the contention that the south half of section 22 could not be considered riparian land because its description on the survey does not call for the river as its boundary, we are referred to Smith v. St. L. Public Schools, 30 Mo. 290; Benson v. Morrow, 61 Mo. 345; Buse v. Russell, 86 Mo. 209; Ellinger v. Railroad, 112 Mo. 525; Sweringen v. St. Louis, 151 Mo. 348. But in none of those cases had the river cut away the intervening land and given the land in question a river boundary in fact. Those decisions go no farther than to hold that if the call in the deed is for a boundary short of the river, for example to a street or to a wharf line, the grant is not to the river and the land granted is not riparian.

This court has not said in either of those cases, and we doubt if any court has ever said, that land acquired under a deed giving metes and bounds which do not reach the river, which in fact did not reach the river when the deed was made, does not become riparian when the intervening land is washed away and the river in fact becomes a boundary.

It is said, as in support of the plaintiff's claim, that the United States never parted with the title to the fractional north half of section 22 until 1896 when the patent under which plaintiff claims issued. But that fact does not alter the law of the case. If the Government parted with the title to the south half, but held title to the fractional north half until the latter was entirely washed away and accretions formed against the south half, they became the property of the owner of the south half. The owner of the south half holds his title as much from the Government as does the owner of the north half; a patent to the south half would carry to the grantee not only title to the then present land but also all the incidents of ownership, of which is the ownership of accretions. The learned counsel for respondent

in their brief say: "In the absence of express legislation by Congress, the rules of the common law applied to its (the Government's) ownership of this land and as plaintiff's grantor obtained the patent for it in 1896 this action should be reviewed as if the Government itself at the time of the grant had found the defendants on the survey of this land, and had brought an action to evict them." That is true; the common law does apply to the title held by the Government (except in certain particulars, as for example, that it is not affected by prescription or the statute of limitations) in the same manner that it applies to the title held by an individual, and it is by virtue of the rules of the common law, as declared by the courts of this country, that the accretions in question in this suit, if they formed against the south half, after the fractional north half had entirely disappeared in the bed of the river, belonged to the owner of the south half. When this fractional north half was surveyed and offered for sale by the Government, it was visible land, capable of being held in possession; it was not in the bed of the river. The Government never undertook to sell land the metes and bounds of which were at the bottom of the river, and if it should sell land bounded by a river, that boundary is subject to shifting the same as if an individual was the seller. The Supreme Court of the United States, speaking of land belonging to the Government, has said: "Where a waterline is the boundary of a given lot, that line, no matter how it shifts, remains the boundary, and a deed describing the lot by number or name conveys the land up to such shifting line exactly as it does up to a fixed line." [Jeffries v. East Omaha Land Co., 134 U. S. 178, l. c. 196.]

And as bearing on this point we quote again from that court: "The United States have not repealed the common law as to the interpretation of its own grants, nor explained what interpretation should be given to or imposed upon the terms of the ordinary conveyances.

which they use, except in a few special instances; but these are left to the principles of law, and rules adopted by each local government, where the lands may lie. In our judgment, the grants of the Government for land bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie." [Hardin v. Jordan, 140 U. S. 371.]

The learned counsel for appellant in their brief illustrate the proposition under consideration by such an apt hypothetical case that we quote it:

"Suppose A. owns a tract of land which does not touch the river, but in front of it are lots 1 and 2 which belong to the United States. B. buys lot 1 and then the river entirely cuts away both lot 1 belonging to B. and lot 2 belonging to the Government, encroaching on A. Then accretions form on A.'s land and extend over the places formerly occupied by lots 1 and 2. C. now gets a patent to lot 2. Is C, who bought a spectral title any better off than B. who bought a real title?"

This case ought to have been submitted to the jury on the theory that if the fractional north half of section 22 was, entirely washed away, making the south half the river front, then if the accretions formed against the south half, they became the property of the owner of the south half, even though they extended over and beyond the space where the fractional north half had been when the survey was made.

The judgment is reversed and the cause remanded to be retried according to the law as herein declared. All concur.